Unified Judicial System

 

 
 Courtesy of The State Bar of South Dakota and
South Dakota Continuing Legal Education, Inc.
222 East Capitol Ave.
Pierre, SD 57501
GREAT WEST CASUALTY CO., 
Plaintiff and Appellee, 
v.
LEE CLARK BERGESON, 
d/b/a C.L.B. Express, and Raymond Deal,
Defendants and Appellants,
and Todd Larson,
Defendant.
South Dakota Supreme Court
Appeal From The Eighth Judicial Circuit, Harding County, SD
Hon. John W. Bastian, Judge
#19114 â Reversed
Edward C. Carpenter, Costello, Porter, Hill, Heisterkamp & Bushnell, Rapid City, SD
Attorneys for plaintiff and appellee.
Ronald W. Banks, Banks, Johnson, Colbath & Kerr, Rapid City, SD
Attorneys for defendant and appellant Bergeson.
Rick Johnson, Johnson, Eklund, Nicholson & Dougherty, Gregory, SD
Attorneys for defendant and appellant Deal.
Considered On Briefs Nov 28, 1995; Opinion Filed Jun 19, 1996
KONENKAMP, Justice.
[Â¶1] Insurer brought a declaratory judgment action contending a passenger injured in a trucking accident was excluded from policy coverage as an "employee." The trial court granted summary judgment for the insurer. Discerning genuine issues of material fact, we reverse and remand.
FACTS
[Â¶2] Great West Casualty Insurance Co. furnished a commercial lines trucker's liability policy to C.L.B. Express, an interstate trucking business. The policy excluded coverage for injuries to employees. Lee Bergeson, owner of C.L.B. Express, had declined workers' compensation coverage. Bergeson contacted Ray Deal about working as a truck driver. They agreed to meet at a truck stop in Sturgis. While there, Deal provided his driver's license number, social security number and address to Bergeson, who requested this information for employment purposes and to give it to Great West so it could check Deal's driving record to decide if he qualified as a covered driver under the policy.
[Â¶3] When Todd Larson, an employee of C.L.B. Express, arrived at the truck stop, Bergeson asked Deal if he wanted to ride along with Larson to see what the job entailed. Without being compensated, Deal agreed to travel that evening with Larson to Glasgow, Montana to pick up cattle and transport them to Rapid City. Deal wanted to decide after the trip whether to accept employment. Later that same night Bergeson called Bear Butte Insurance Agency to add Deal as a named driver on the Great West policy. En route Larson explained how to operate the truck and how to prepare required paperwork. Larson drove from Sturgis to Bowman, North Dakota. Deal then drove from Bowman to Glasgow while Larson slept. After both loaded the cattle, Larson drove while Deal slept. In the early morning hours of October 22, 1993 Larson ran off the road causing the truck to tip over. Deal was injured.
[Â¶4] Deal brought a civil suit against Larson and Bergeson, d/b/a C.L.B. Express. Great West agreed to defend them, but reserved the right to later withdraw upon a showing the policy provided no coverage for the accident. Great West then sought declaratory relief in this action and moved for summary judgment asserting its policy afforded no coverage for injuries sustained by Bergeson's employee. {fn1}  The circuit court granted Great West's motion for summary judgment, stating that "[w]hile there may be a question of fact regarding whether Deal had been actually hired as an employee, there is no question that he was 'trying out' for employment." Relying upon decisions from other jurisdictions which hold that a "tryout" constitutes employment for workers' compensation purposes, the court concluded Deal was Bergeson's employee and Larson's fellow employee, thus coverage was excluded under Great West's policy. Deal and Bergeson both appeal alleging the court erred in ruling Deal an employee. 
DISCUSSION
[Â¶5] In reviewing a grant of summary judgment, we must decide whether the moving party has shown there is no genuine issue of material fact and is entitled to judgment as a matter of law; the evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party. Nelson v. Web Water Development Ass'n., Inc., 507 NW2d 691, 693-94 (SD 1993); Pickering v. Pickering, 434 NW2d 758, 760 (SD 1989).
[Â¶6] Workers' compensation statutes are liberally construed to provide coverage, even when a worker would rather avoid it. Jensen v. Sport Bowl, Inc., 469 NW2d 370, 371 (SD 1991). Both sides acknowledge, the existence of an employment relationship is ordinarily a question of fact. Goodman v. Sioux Steel Co., 475 NW2d 563, 565 (SD 1991). Yet when such relationship is clear, it may be determined by the court. Steen v. Potts, 75 SD 184, 189, 61 NW2d 825, 828 (1953). No single factor can be determinative; each case must be decided on its own facts. Davis v. Frizzell, 504 NW2d 330, 331 (SD 1993).
[Â¶7] Great West contends Deal was "trying out" for employment, making him Bergeson's employee, covered by South Dakota workers' compensation laws and specifically excluded under the insurance policy. Although we have never had occasion to decide the issue, courts faced with this question have commonly held that when an employer requires a prospective employee to demonstrate skills as a prerequisite to a job offer, the "tryout" constitutes employment for workers' compensation purposes. See Howard Sheppard, Inc. v. McGowan, 224 SE2d 65 (GaCtApp 1976)(prospective employee killed while being road tested); Moore v. Gundelfinger, 223 NW2d 643 (MichCtApp 1974)(injury during "tryout" compensable as a matter of law); Erickson v. Holland, 295 NW2d 576 (Minn 1980)(prospective employee injured while demonstrating ability to operate truck).
[Â¶8] Job applicants demonstrating their employability is an essential component in all "tryout" cases. See generally,Lisa K. Gregory, Workers' Compensation: Compensability of Injury During Tryout, Employment Test, or Similar Activity Designed to Determine Employability, 8 ALR5th 798 (1992). Recognizing the beneficent design underlying workers' compensation, the modern approach surmounts traditional contract guidelines in favor of coverage for the injured, because in trying out, the prospective employee is required to incur the risks of employment even though not formally hired and the employer often benefits from the "tryout." Id. 

Since workers' compensation law is primarily interested in the question when the risks of the employmen[t] begin to operate, it is appropriate, quite apart from the strict contract situation, to hold that an injury during a try-out period is covered, when that injury flows directly from employment activities or conditions.
1A Larson, Workmen's Compensation Law Â§26.26 (1995). The facts here are not so clear that we can conclude as a matter of law Deal was engaged in a "tryout." Drawing all reasonable inferences favoring the nonmoving party, as we must in a summary judgment case, Bergeson offered Deal a job he had yet to accept and Deal was not required to prove any skills to get the job. {fn2}  By accompanying Larson on the truck route and exploring what the job entailed, Deal insists he was merely trying to decide whether to accept employment, not attempting to prove he was worthy of it. If this version is true, it cannot constitute a "tryout" as that concept is used in workers' compensation law. See also North v. Floyd County Bd. of Educ., 442 SE2d 809, 811 (GaCtApp 1994)(extent of control exercised by employer over employee during tryout period is a question of fact). It is not our function to weigh credibility in the decision making process, but if after determining the facts, the circuit court concludes no "tryout" occurred, then it must resort to conventional contract analysis.
[Â¶9] Great West asserts Bergeson's contact with Bear Butte Insurance Agency, adding Deal as a driver, tends to prove the formation of an employment contract. In Childs v. Kalgin Island Lodge, 779 P2d 310 (Alaska 1989), adding a prospective employee to an employer's insurance coverage suggested an employment relationship, though all of the formal hiring processes had not been completed. Yet the employee in Childs orally accepted a job offer and anticipated being paid for his services. Deal, on the contrary, declares he never accepted an offer before the accident nor did he expect compensation. The contact with Bear Butte Insurance Agency, while a factor to be considered in determining whether an employment contract existed, cannot fix such relationship as a matter of law.
[Â¶10] No injury is covered by workers' compensation unless "arising out of and in the course of the employment." SDCL 62-1-1(7). This means the injury must have "its origin in the hazard to which the employment exposed the employee while doing his work." Roberts v. Stell, 367 NW2d 198, 199 (SD 1985). An "employee" is "every person, including a minor, in the services of another under any contract of employment, express or implied... ." SDCL 62-1-3. Identifying a contract of employment under SDCL 62-1-3 is essential to workers' compensation coverage. Goodman, 475 NW2d at 564; Roush v. Town of Esmond, 73 SD 406, 409, 43 NW2d 547, 549 (1950). Implied contracts must contain all the elements of express contracts. St. John's First Lutheran Church in Milbank v. Storsteen, 77 SD 33, 37, 84 NW2d 725, 727 (1957). "An implied contract is one, the existence and terms of which are manifested by conduct." SDCL 53-1-3.
[Â¶11] Four essential elements must exist to create a contract: (1) parties capable of contracting; (2) their consent; (3) a lawful object; and (4) sufficient cause or consideration. SDCL 53-1-2. Deal's consent to create an employment relationship and sufficient consideration are genuine issues of material fact. In his treatise on workers' compensation, Professor Larson states: 

Compensation law ... is a mutual arrangement between the employer and employee under which both give up and gain certain things. Since the rights to be adjusted are reciprocal rights between employer and employee, it is not only logical but mandatory to resort to the agreement between them to discover their relationship. To thrust upon a worker an employee status to which he has never consented would not ordinarily harm him ... but it might well deprive him of valuable rights ... notably the right to sue his own employer for common-law damages.
1B Larson, Â§47.10 (1995)(footnote omitted); see Smick v. Burnup & Sims, 666 P2d 926 (WashCtApp 1983)(person cannot have employee status thrust upon him without such person's consent to the relationship). Viewing the evidence most favorable to Bergeson and Deal, we cannot state it was "clear" an employment relationship had been established as a matter of law.
[Â¶12] Reversed and remanded.
[Â¶13] MILLER, Chief Justice, and SABERS, AMUNDSON and GILBERTSON, Justices, concur.
Footnotes
fn1 . The applicable policy provisions state: 

B. EXCLUSIONS
This coverage does not apply to any of the following:

3. WORKERS COMPENSATION
Any obligation for which the "insured" or the "insured's" insurer may be held liable under any workers compensation, disability benefits or unemployment compensation law or any similar law.
4. EMPLOYEE INDEMNIFICATION AND EMPLOYER'S LIABILITY
"Bodily injury" to:

a. An employee of the "insured" arising out of and in the course of employment by the "insured"... .
fn2 . In his deposition, Bergeson stated in part:

Q: All right. And, then, it's my understanding that you did get his -- did he give you some information, in case he went to work for you?
A: I got his driver's-license number from him because it don't -- really, one of -- the decision ain't totally mine, whether I hire somebody or not, I have to turn that in to the insurance company, and they run a driver's-license check on it, and they -- they could tell me that, you know, due to the things that he's done on his record, that I can't hire him, no matter what I want. ...
Q: And was he supposed to -- Assuming things had gone right, was he supposed to check back with you, then, again, Monday?
A: Right. We were going to talk, when he got back, and then we would have made the decision whether he was going to go on, and we -- you know, there's paperwork that needed to be filled out and get everything ready for him to start work on Monday morning. ...
Q: Well, what do you remember, then about the circumstances by which Ray [Deal] ended up in that truck that night?
A: Well, Ray [Deal] knew Todd [Larson], and we talked about the job and -- and asked if Ray [Deal] would be -- you know, if he wanted to ride with Todd [Larson] and see what the -- the job, in detail, before he made his decision. ...
Q: Did you tell Ray Deal that he had to take that trip, as a prerequisite for going to work for you?
A: No.